# Houser's Case.

*Contempt of court—Tampering with jurymen—Embracery—Fine.*

1. Where, in an action against a railway company, twenty men are called into the jury box, from whom twelve are to be selected, but the jurors are not selected and sworn until the following day, and in the meantime an employee of the railroad company approaches one of the jurymen who was an intimate friend, and tells him that if he can do anything for the railway company "it will be appreciated," the person approaching the juror may be fined for contempt of court; and in such a case the fine of $1,000 will not be reversed by the appellate court, although the offender may be convicted and sentenced for embracery under the Act of March 31, 1860, P. L. 382.

2. The findings of a judge in a proceeding for contempt will not be reversed where there is evidence to support them, and there is no manifest error.

Argued March 8, 1914. Appeal, No. 36, March T., 1914, by William Houser, from order of C. P. Luzerne Co., Dec. T., 1913, No. 684, adjudging the respondent in contempt of court In re William Houser. Before RICE, P. J., HENDERSON, ORLADY, HEAD, PORTER, KEPHART and TREXLER, JJ. Affirmed.

Petition of Edward Mangan for a rule to show cause why William Houser should not be punished for contempt of court.

The facts are stated in the opinion of the Superior Court.

*Error assigned* was the order fining the defendant $1,000 for contempt of court.

*Andrew Hourigan,* with him *B. R. Jones* and *Jos. P. Flanagan,* for appellant.

*James L. Lenahan,* with him *James T. Brennan,* for appellee.

OPINION BY ORLADY, J., April 20, 1914:

This is an appeal from an order, adjudging the appellant guilty of contempt of court, and an earnest argu-

ment is presented to distinguish this case from Greason v. Cumberland Railway Co., 54 Pa. Superior Ct. 595. The only difference, and it is not a material one, lies in the fact that the objectionable conversation in this case was had with a juror, before he was in fact sworn, though at the time "called into the jury box as one of the twenty jurors from which number the trial twelve were to be selected," and was subsequently impaneled as such juror in that cause. To approve of such a dividing line between danger and safety, in an obvious attempt to influence the mind of a juror, would nullify all provisions to safeguard them from such dangerous agencies, and would furnish an effective and ingenious method for doing the very thing which common-law rules and our statute prohibit.

The facts of the case were very fully investigated in the court below. The appellant and his witnesses were accorded every chance to explain his conduct. He was aided by zealous counsel. The proceeding was regular in every particular, and the conclusion reached was fully warranted by the evidence. The Greason case has been so recently decided that it is not necessary to again review the authorities.

The controlling facts established by the evidence are as follows: Morris Williams and William Houser were each regularly summoned as a juror for the term of the court of common pleas of Luzerne county for the week beginning October 20, 1913, and in response to that summons were in attendance as jurors during that week. The case of Edward Mangan and wife against the Wilkes-Barre Railway Company, was called for trial on October 22, and Morris Williams was called by the clerk as one of twenty jurors, and took his place in the jury box. Owing to some difficulty in securing a jury the court adjourned until the next day, and these two men returned to their homes at the borough of Parsons, where Williams was a shopkeeper, and Houser was a justice of the peace, and had been for the past three years a con-

ductor in the employ of the defendant railway company. They had been intimate personal friends for sixteen years; their homes were on the same lot and at the time they were engaged in confidential political undertakings. During the evening of the twenty-second, Houser and Williams talked about the cases in court. Houser testified, at the hearing on the rule, viz: "When he came in to my office, I spoke to him, 'Morris, I am surprised to see you this evening, I thought you were locked up.' He says, 'Why, what made you think that?' I said, 'I thought you hadn't agreed on that case.' 'What case have you reference to?' I says, 'The Hudock case.' He said, 'Oh, we settled that up quick, that was nothing,' and he says, 'I am on another case now, I am on one of your cases.' I says, 'What do you mean?' He said, 'I am on a traction case.' 'Well,' I said, 'I guess we won't get together on that, I am drawn in another court room, and if I did get on that case they would expect me to favor the company anyhow.'" Williams testified at the same hearing, as follows: "Mr. Houser came in my store, and he says, 'It looks as if you are going to be on the jury against the traction company, and, Morris, if you can do anything for the traction company it will be appreciated.'" The Mangan case was on trial from Wednesday until Friday afternoon, when it was submitted to the jury, and on Saturday the jury was discharged for the reason that they could not agree upon a verdict. During the deliberations of the jury, Williams mentioned to his fellow jurors the conversation he had with Houser, and the subject was brought to the attention of the court, when this proceeding was instituted, on a petition presented by Mangan for a rule to show cause, etc.

It was not disclosed in the testimony, when, how, or by whom Williams was to receive "the appreciation," if he did anything for the railway company, but when we consider the relation these persons held toward each other; their knowledge of the character of the action, by

designating it, "I'm on one of your (Houser's) cases, I'm on a traction case;" their personal, political and social intimacy, their evident reticence on the hearing in disclosing all the facts, it is futile to urge that the suggestion or request was a disinterested one. The subject of the conversation was apparent as direct words would have made it, and such a solicitation from such a source would ordinarily produce. as effective a conclusion as if a specific request had been made. Was the fine imposed an excessive one under the circumstances? Art. 1, sec. 13, of our state constitution provides, that, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted."

The appellant concedes that the offense if made out is that punishable as "Embracery" under our Crimes Act of March 31, 1860, P. L. 382. We accept the finding by the learned trial judge as equivalent, in its conclusiveness of the appellant's guilt, to the verdict of a jury. The evidence was to some extent conflicting. It was conceded that these parties talked about the case, and it is apparent that they did not disclose all that was said about it. The credibility of the witnesses, and in a large degree the conclusions to be drawn from their testimony, which depends upon their character, intelligence, knowledge of the subject and personal interest, can be determined much better by the judge who hears them than by appellate judges on an appeal: Steinmeyer v. Seibert, 190 Pa. 471. When the correctness of findings depends upon the view to be taken of the direct testimony of witnesses which is in conflict, it had uniformly been held, that they will not be disturbed except for error which clearly appears, and that an apparent preponderance of testimony against them is not sufficient to lead to a reversal, if there is testimony which, if believed, will warrant them: Canavan v. Paye, 34 Pa. Superior Ct. 91. And they will not be set aside, unless there is manifest error: Davis v. Pipe Lines, 34 Pa. Superior Ct. 438; Com. v. Stevens, 178 Pa. 543. Fur-

ther, in reviewing this record we have not what is often an important and sometimes controlling factor in such a case, the frankness and general bearing of the accused under examination, which to the observing investigator often aids in determining the degree of culpability, the genuineness of the defense, and the extent to which like practices have affected the administration of the law in that county. Such crimes are extremely difficult to prove, and the purpose in imposing punishment is as much to deter the offender and others from committing like offenses, and to protect society, as it is to personally penalize the guilty person. The report of the commissioners on our Penal Code refers to Embracery, as defining the offense at common law, and the statute amplifies that definition by making it unlawful for any person to attempt to corrupt or influence any juror in a civil or criminal court . . . . by endeavoring either in conversation or by written communication, or by persuasion, promises, or entreaties or any other private means to bias the mind or judgment of a juror as to any cause pending to which such juror has been summoned, etc., and fixes the punishment at a fine not exceeding $500, or an imprisonment not exceeding one year, or both or either at the discretion of the court. It must be conceded that the Mangan case was then pending, and a summary proceeding may be resorted to in the punishment of so flagrant an offense. The court or a party aggrieved is not limited to a criminal prosecution. The remedies for this wrong are concurrent.

There is nothing in this record to warrant our holding that the court abused its judicial discretion either in finding the facts or in fixing the amount of the fine. To change the amount of the fine would be but a guess on our part as to the degree of the offense committed, and this without all the facts and attendant circumstances before us.

The order and judgment is affirmed.