## In re McDonald

*John B. McGurl* and *L. E. Enterline*, amici curiæ, for rule.

*J. J. Gallagher* and *R. M. Bashore*, for respondent.

HICKS, P. J., April 15, 1935.—On June 4, 1934, the grand jury convened for the purpose of passing upon bills of indictment for trial during the regular June term of criminal court. Theretofore, Henry J. Seip of 242 Clay Street, Tamaqua, this county, was regularly summoned, and on Monday, June 4, 1934, he took the oath and was in the performance of his duty as a member of the said grand jury. The following day, in the borough of Tamaqua, Dr. J. J. McDonald approached the said

grand juror while the latter was on his way to the court house for service as a member of the grand jury and asked him if any of the election cases had yet been presented to them for action. He suggested to the juror that the prosecutions were not well founded and that the defendants charged therein should not be tried. The foregoing was the subject-matter of the court's statement, brought to its attention through an affidavit of the said grand juror on June 6, 1934, and filed 2 days later, in pursuance of which, the court, on June 18, 1934, directed the pending rule to issue to show cause why the respondent should not be adjudged guilty of contempt of court. No answer was filed to the rule. A hearing was had before the court en banc on December 17, 1934, and argument on February 11, 1935. It is undisputed that three cases, charging the violation of the election laws, were listed for presentation to the said Grand Jury during its sitting, to wit: Commonwealth v. Edward Paska, nos. 1423*a*, 1423*b*, 1423*c* and 1423*d*, November term, 1933, and subpoenas issued in the cases.

The respondent challenges the power of this court to determine the issues in this case summarily and inflict punishment therefor because the attempted influence of the juror in service and in attendance at court was exercised in the Borough of Tamaqua and not in the presence of the court, and urges that the remedy is by indictment.

One who attempts to influence or prejudice a juror, grand, petit or traverse, in the discharge of his duty, incurs a threefold liability, namely, (1) summary punishment by the court; (2) indictment for contempt or embracery; and (3) an action for damages: In re Edith Miehle, 24 Sch. L. R. 50, 56; Doan's Case, 5 Dist. R. 211, 212. Under the Act of June 16, 1836, P. L. 784, sec. 23, 17 PS §2041, not only in cases of misconduct of the officers of the court, or disobedience or neglect by officers, parties, jurors or witnesses of or to the lawful process of the court, but where there is misbehavior of any person in the presence of the court, thereby obstruct-

ing the administration of justice, the court may inflict summary punishment for contempt of court. By section 24 of said act, 17 PS §2042, contempts committed in open court may be punished by imprisonment and all others by fine only.

Contempts are classified as direct and indirect, or, as it is sometimes called, constructive. Those that are committed in the face of the court and are punishable by commitment and fine are direct contempts, and those that are committed out of the presence of the court and are punishable by attachment are indirect, or constructive, contempts. A direct contempt consists, therefore, of words spoken or acts done in the presence of the court, or during its intermissions, which tend to subvert, embarrass, or prevent justice. Within the meaning of the statute, the court, at least when in session, is present in every part of the place set apart for its use and for the use of its officers, jurors, and witnesses, and misbehavior anywhere in such place is misbehavior in the presence of the court: I Standard Pennsylvania Practice, 69, sec. 82.

Under the Act of 1836, supra, sec. 24, contempts not committed in open court are punishable by fine only. It is a fair construction of sections 23 and 24 of said act to hold that it provides for, and authorizes the imposition of, a fine for an indirect or constructive contempt, as distinguished from an actual one committed in the presence of the court, as one offered elsewhere than in the actual view of the court and during the progress of a trial and which tends, by its operation, to degrade or make impotent the authority of the court or in some manner to impede or embarrass the due administration of justice. To constitute such a constructive contempt, some act must be done, not in the presence of the court, that tends to obstruct the administration of justice or bring the court, or judge or administration of justice into disrespect: Greason v. Cumberland Ry. Co., 54 Pa. Superior Ct. 595, 600.

The offense in this case, if any, was not, it is true, com-

mitted in the actual presence of the court, or during the trial of the case in the court room, nor in or about the court house or grounds appurtenant thereto. But we do not doubt, for that reason, the authority of the court to punish such an offense summarily.

In the case of Greason v. Cumberland Ry. Co., supra, one Derr, a neighbor of the plaintiff, who had been a witness for him on the first trial and expected to be called on the retrial of the case, accompanied the jury, in charge of a bailiff, to view the premises in question after adjournment of court. "One of the jurors, Solomon Shelton, and Derr had been intimate acquaintances for many years, and after the jury of view had inspected the premises they were permitted to return to their homes for the night. *During the ride on the car to their homes* [italics ours], Derr engaged Shelton in conversation": the subject of the contempt (page 597).

"The jurors had been regularly impaneled and in the discharge of one of their duties they had been directed to view the premises, and between the adjournment and convening of the court this conversation occurred": (page 598).

"The conduct of Derr could not be designated as anything else than a deliberate attempt to influence a juryman while in service, and in attendance upon the court, and as such must be regarded as a contempt for the orderly administration of the law, which cannot be tolerated under any subtle definition as to the place where it occurred. Nor do we doubt the authority of the court to punish such an offense summarily": (page 599).

It will be noted from a close reading of the cited case, that the conversation with the juror took place after the adjournment of and away from the court, after the jury had performed all its duties for the day, and while the juror was proceeding to his home in a car from the place of his last performance of duty. In the instant case, the conversation took place while the juror was on his way to court and his duties. Surely, it is of no consequence,

under the authority of the Greason case, whether the juror was going home from duty or going to his duty in the court house from his home. As in the cited case, the grand juror, Seip, was impaneled, sworn, and in the performance of his duty as such.

The Supreme Court, in approving the Greason case, in Snyder's case, 301 Pa. 276, 285, 286, says that the former "properly holds that to tamper with a juror while the panel was sent by the court, in charge of a bailiff, to visit the locus in quo, was punishable summarily as a contempt of court. An act so punishable must be done in the actual or constructive presence of the court, otherwise it becomes a misdemeanor, subject to indictment as such." Respondent argues that in the Greason case the attempted approach "was to a juror after he visited the scene of the accident that was being tried, and in charge of a court bailiff" and the reference by the Supreme Court on pages 285, 286, in the Snyder case, supra, seems to state that the tampering occurred while the jury was in charge of a bailiff of the court. A reference to page 597 of the Greason case, supra, and already referred to here, very clearly shows that "after the jury of view had inspected the premises they were permitted to return to their homes for the night. *During the ride on the car to their homes*," [italics ours], the respondent in that case wrongfully attempted to influence a juror. In other words, the act took place on a car, after the juror had completed his duties of the day and was on his way to his home. And in the instant case, the act took place while a grand juror was on his way to the court house from his home to resume the duties which he had undertaken the day before. There is no real distinction between that and this case and subtle refinement has no place in considering the corruption of the jury system, so vital a part of the machinery of the administration of justice.

That a contempt of court may be punishable by indictment does not mean that it may not be punishable sum-

marily in any case. In Houser's Case, 57 Pa. Superior Ct. 43, it was held that the remedy for the wrong committed when a juror is corruptly approached is by criminal prosecution or by a summary proceeding, and that these remedies are concurrent.

In 1920, in In re John Connor, 16 Sch. L. R. 325, where the respondent, in a summary proceeding, was adjudged guilty of contempt in attempting to corrupt a juror, Berger, J., speaking for this court, said on page 326: "We have elected to proceed summarily in this case because it is not an uncommon practice for citizens of our county to speak to jurors or in their presence for the purpose of influencing them, or in a manner calculated to influence them in the discharge of their duties as jurors." In that case, he had also been indicted.

If we must accept the interpretation of sections 23 and 24 of the Act of 1836, supra, as urged by the respondent in this case, that tampering with, attempting to or corrupting a grand juror away from the court house may be punished only by indictment then the courts are helpless indeed in maintaining the integrity of the jury system and such serious and offensive conduct will more frequently than not go unpunished. The respondent in this case and four others were presented at the same time to the grand jury for indictment by the district attorney at the suggestion of this court and in each instance the grand jury refused to indict. To say that one who attempts to corruptly influence a grand juror away from the court house can be punished only upon indictment by a grand jury and conviction by a petit jury is to say that he shall be afforded two other opportunities to commit a like unlawful act to escape punishment for his original wrong doing. And he generally succeeds.

Grand jurors are officers of the court, convened in obedience to a summons issuing from the tribunal which requires their services in deciding facts as they shall apply them to rules of law determined by the court: Commonwealth, ex rel., v. Crans, 2 Clark 172. In the case of Com-

monwealth v. Kauffmann, 1 Phila. 534, it is said: "From the moment that the name of the juror is announced in the papers, yes, from the time it is drawn from the wheel, his person is consecrated to the purposes of justice. The law draws around him an invisible cordon, which no man may pass but at his peril. It is as complete the moment he is selected as when he is empanneled."

We have held heretofore that one might be summarily dealt with where he attempted to influence a juror at the entrance to the court house grounds and coming up the steps to the building: In re Joseph Joulwan, 18 Sch. L. R. 261. In the case of In re Edith Miehle, 24 Sch. L. R. 50, the respondent wrote a letter to the foreman of the grand jury and met him in his home and in the public library in the City of Pottsville where she discussed an investigation then being carried on by the grand jury and submitted to him the names of witnesses to be called. We adjudged her guilty of contempt in a summary proceeding. In Guarantee Trust & Safe Deposit Co. v. Heidenreich et al., 5 D. & C. 184, Rowley was a juror, and Mrs. Tomat, a witness. After the adjournment of court on one of the days of the trial, the juror and witness walked and talked together about the case from the court house to a corner in the center of the City of Pottsville. Both were summarily adjudged guilty of contempt. In Houser's Case, 57 Pa. Superior Ct. 43, Williams and Houser were each regularly summoned as traverse jurors and were in attendance at court. The latter was an employe of a railway company which was the defendant in an action in which 20 men, including Williams, were called into the jury box and from which 12 were to be selected. The jurors were not selected and sworn until the following day, and the night before Houser carried on an objectionable conversation with Williams in the former's office about the case. He was summarily adjudged guilty of contempt, the court, on page 47, declaring: "It must be conceded that the Mangan [railway] case was then pending, and a summary proceeding may be resorted to in the punishment of so flagrant an

offense. The court or a party aggrieved is not limited to a criminal prosecution. The remedies for this wrong are concurrent."

In that case, the appellant earnestly argued to distinguish it from Greason v. Cumberland Valley Railway Co., supra. On page 44, the court said:

"The only difference, and it is not a material one, lies in the fact that the objectionable conversation in this case was had with a juror, before he was in fact sworn, though at the time 'called into the jury box as one of the twenty jurors from which number the trial twelve were to be selected,' and was subsequently impaneled as such juror in that cause. To approve of such a dividing line between danger and safety, in an obvious attempt to influence the mind of a juror, would nullify all provisions to safeguard them from such dangerous agencies, and would furnish an effective and ingenious method for doing the very thing which common-law rules and our statute prohibit."

Respondent urges upon us the case of Doan's Case, 5 Dist. R. 211, as decisive against summary action in this case, and in the syllabus of the case, we find: "Talking to a grand juror upon matters proper for inquiry by the grand jury away from the court and grand jury rooms is contempt of court, punishable after indictment only." This is not supported by the opinion of Yerkes, P. J. One objectionable conversation took place on Doan's farm while a grand juror was preparing to go to a meeting of the grand jury and another in the lobby of the court room. But the court did not pass on the question as to whether he might be summarily punished. On page 212, after stating that the court was not disposed nor required to construe his conduct as constructive contempt in order to find a corrective, Judge Yerkes continues: "He disputes the facts, and our duty is better performed by avoiding their determination and by submitting them to a jury, as we prefer to do in all such cases. . . . We shall therefore pass to the consideration of the defendant's liability to indictment for the criminal offences of contempt of court, ob-

structing the administration of justice, and embracery."
In Snyder's Case, 301 Pa. 276, the Supreme Court, in re-
ferring to the Doan's Case, does not cite it as decisive of
the proposition stated in the syllabus of the latter case,
that indictment was the exclusive remedy. On page 286,
it is stated: "In Doan's Case, 5 Dist. R. 211, the late Judge
Yerkes, in a comprehensive opinion held that conversing
with a grand juror, away from the court and grand jury
room, was a contempt of court punishable by indictment."

The case of Commonwealth v. Myers, 19 Dist. R. 1136,
is wholly inapplicable and is not in point. In that case,
the defendant published an article in a newspaper refer-
ring to certain election frauds then pending in court. The
contemptuous article fell squarely within the provisions
of sections 26 and 27 of the Act of 1836, supra. And in
Snyder's Case, supra, the Supreme Court held that the
scattering of cartoons broadcast over the county and the
general making of political speeches must be punished
under the said sections 26 and 27 by indictment and not
by summary action. This case is also inapplicable. Sec-
tion 26 provides that the author, printer, publisher, or
either of them shall not be liable to attachment and sum-
mary punishment for any publication, out of court,
*respecting the conduct* [italics ours] of the judges, offi-
cers of the court, jurors, witnesses, parties or any of them,
of, in or concerning any cause depending in such court;
but, section 27 provides, if such publication shall improp-
erly tend to bias the minds of the public, or of the per-
sons named in section 26, an aggrieved party may proceed
by indictment or an action at law for damages. We do not
think the alleged attempt in this case to influence the
grand juror falls within sections 26 and 27.

At the hearing on the rule to show cause why he should
not be adjudged guilty of contempt, the respondent testi-
fied in his own behalf. Full opportunity was accorded to
him to present anything in his behalf. From the record,
it clearly appears that Henry Seip knew the respondent
for some time and the latter knew the former very well by

sight. It is not denied that Seip was a grand juror and had served as such the day previously. On the day in question, Seip was en route to the court house to resume his duties and was standing on a street corner in Tamaqua, the place of his residence, waiting for Winn Scott, a probation officer, to take him to court when a motorist came along who proved to be the respondent. The juror having stepped off the curb as the motorist approached, the respondent stopped, recognizing Seip. Upon inquiry, the latter told him he was going to Pottsville and the respondent then said: "That is right. You are a juror?" Seip replied affirmatively. Hence the respondent knew he was a juror. Being apprised, the wrongful conversation then followed. Dr. McDonald then asked: "Did those election cases come up yet?" (There were such cases pending for hearing before the grand jury of which Seip was a member.) The juror answered: "No, not that I recall; we didn't have any election cases." The respondent then said: "That is a lot of hooey or a lot of bull; there is nothing to it; those boys were coached in that stuff for a long time and they don't know anything about it. Those cases, I think they were framed, but in my opinion I think they should be thrown out." At this point, the respondent was forced to move because of the approach of another car, and the juror replied that he was going "over there to vote as" he saw fit, as his conscience dictated and so he expected to do. We are not impressed by the explanation of the respondent, both by his attitude on the witness stand and the incoherency of his story. As to the former, the following question and answer are typical. Under cross-examination, the respondent was asked: "You don't have a very distinct recollection of what (Seip) said?" He answered: "Not exactly. What I would say would not make any difference." He admits asking the juror where he was going and explains that he did not introduce the election cases but that the juror did when he asked him what is at best a veiled question: "By the way, has any of the boys talked to you". meaning, he says, members of

the Elks which organization he was thinking of joining. This brought forth the surprising reply, he says, "Oh! so you are interested in the Shenandoah ballot box case, are you?" He admits that he knew of these cases and that he said he thought "it is a lot of bunk" and as he drove away, out of the clear air, the juror replied, "I am going to let my conscience be my guide."

This respondent did what too many in this county are doing, assuming to discuss with jurors cases pending in court, to the degradation of the administration of law and the obstruction of justice. Too often does the judge on the bench sense the sinister influence of jury fixing until it has become a stench. Grand juries fail to indict and petit juries to convict for no other reason than the corrupting influence of the jury fixers. And we may well repeat the words of Judge Berger announced fifteen years ago that "it is not an uncommon practise for citizens of our county to speak to jurors or in their presence for the purpose of influencing them, or in a manner calculated to influence them in the discharge of their duties as jurors." If the jury system is to be protected and preserved, then swift and severe punishment must be dealt him who would corrupt and poison it.

No one can communicate with the grand jury or any of its members in relation to matters which are or may be proper for their inquiry. The grand jury being officers of the court and under its legal direction, are entitled to its protection from assault of every kind, whether the effort is designed to influence them on questions of law or fact, or intended to disturb them in their deliberations when assembled in the court or jury room, or to menace them, by threats or violence, for the manner in which they shall perform their duty, or to control, influence or bias their judgment in any question likely to come before them for their consideration: Doan's Case, supra, pp. 215, 216.

We conclude that the respondent intentionally spoke to one, known to him to be a grand juror, concerning cases before him for disposition in a manner calculated to in-

594

fluence and prejudice him in the performance of his duty: In re Edith Miehle, supra, 55; Commonwealth v. Riley, 113 Pa. Superior Ct. 77, 91. Such conduct is highly reprehensible and criminal. It tended to obstruct the administration of justice and bring it into disrespect. Grand juries as well as all juries must be free from all illegal or corrupt interference by outsiders.

And now, April 15, 1935, Dr. J. J. McDonald is hereby adjudged guilty of contempt and he is directed to present himself before the Court on April 22, 1935, for sentence.

Palmer, J., dissents. From M. M. Burke, Shenandoah.